UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS

BENJAMIN BARTLETT,                )
                                  )
        Plaintiff,                )
                                  )
        v.                        )        15-CV-1466
                                  )
DR. INOUE,[1] et al.,             )
                                  )
        Defendants.               )

## OPINION

**MICHAEL M. MIHM, U.S. District Judge.**

Plaintiff proceeds pro se from his detention in the Shawnee Correctional Center regarding alleged deliberate indifference to a hand fracture he suffered while in the McLean County Jail. In particular, Plaintiff alleges that Dr. Inoue missed diagnosing Plaintiff's fractured hand. Plaintiff further alleges that three nurses (Defendants Brown, Payne, and Sturgill)[2] refused pain medication to Plaintiff. (Merit Review Order, d/e 8.)[3]

---

[1] The docket states that this defendant's name is "Dr. Inove," but the spelling used by this defendant is "Dr. Inoue." The Court assumes that "Inoue" is the correct spelling.

[2] McLean County is named as a defendant, too, but has been kept in this lawsuit for indemnification purposes only. (Merit Review Order, d/e 8, pp. 4-5.)

[3] Plaintiff also argues that defendants failed to protect him from the assault in the first place, but that claim is not before the Court. (1/6/17 Order.)

Defendants move for summary judgment, which is granted for the reasons explained below.

Before addressing the summary judgment motion, the Court addresses Defendants' contention that Plaintiff admitted in his deposition that he did not personally sign any of his pleadings. Plaintiff did make this representation in his deposition, stating that he had someone else sign his name because he cannot use his right hand. (Pl.'s Dep. 137-38.) He appears to confirm this in his response to the summary judgment motion, stating that he has not been able to use his right hand "at all ever[] since the beginning of this lawsuit." (Pl.'s Resp., d/e 40, p. 10.) However, in a later unsigned filing he asserts that he *did* sign his filings, but with his left hand and with help from others. (Pl.'s Notice, d/e 43, pp. 1-2.)

Plaintiff may rely on another inmate to write Plaintiff's filings, but Plaintiff must read those filings before sending them to the Clerk to ensure that the filings are factual. Filings that contain false statements are grounds for sanctions, including dismissal. Plaintiff must also sign all of his filings, with his left hand if need be. Fed. R. Civ. P. 11(a). At this point, the Court will accept

Plaintiff's representation that he did sign the filings and misunderstood the question in his deposition.

## Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).   A movant may demonstrate the absence of a material dispute through specific cites to admissible evidence, or by showing that the nonmovant "cannot produce admissible evidence to support the [material]  fact."  Fed. R. Civ. P. 56(c)(B).  If the movant clears this hurdle, the nonmovant may not simply rest on his or her allegations in the complaint, but instead must point to admissible evidence in the record to show that a genuine dispute exists. Harvey v. Town of Merrillville, 649 F.3d 526, 529 (7th Cir. 2011).

At the summary judgment stage, the evidence is viewed in the light most favorable to the nonmovant, with material factual disputes resolved in the nonmovant's favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A genuine dispute of material fact exists when a reasonable juror could find for the nonmovant.  Id.

## Facts

Dr. Inoue has not numbered his proposed undisputed facts as required by Local Rule 7.1(D)(1)(b).  However, Dr. Inoue does cite to attached exhibits to support each proposed, undisputed fact, and the substantially the same proposed facts are offered by the Nurse Defendants (Brown, Payne, and Sturgill) as numbered facts. Requiring Dr. Inoue to number his proposed facts is unnecessary because the facts are not complex and doing so will only unnecessarily prolong this case.  Similarly, Plaintiff has not addressed each proposed fact as required by Local rule 7.1(D)(2)(b), but he does adequately set forth his reasons why summary judgment should be denied.  Thus, the Court finds the case ready for a decision on the merits, even though technical compliance with Rule 7.1 is lacking.

The relevant events occurred during Plaintiff's detention at the McLean County Jail.  On September 11, 2015, Defendant Nurse Brown saw Plaintiff for an injury to his right hand that he suffered in a fight.  Nurse Brown noted a good range of motion, ordered ice packs as needed for two days, Motrin as needed for seven days, and referred Plaintiff to the physician.  (Brown Aff. ¶ 10.)

Plaintiff received Motrin that day and the next three days before his appointment with Defendant Dr. Inoue. (Nurse Defs.' Undisp. Fact 11.) Plaintiff also received ice packs on those days. (Nurse Defs.' Undisp. Fact 12.) To obtain medicine prescribed on an "as needed" basis, an inmate must submit a request one hour before medical rounds during the day and two hours before the morning medical rounds. (Nurse Defs.' Undisp. Fact 9.)

Dr. Inoue examined Plaintiff's hand on September 14, 2015. Dr. Inoue ordered an x-ray, ice for three days, and ibuprofen for one week. (Dr. Inoue Aff. ¶ 7; 9/14/15 progress note, d/e 36-1, p. 4.) X-rays were taken that same day, with the radiologist report stating that there was no evidence of "acute bony injury" and "no acute bone injury noted." (9/14/15 imaging report, d/e 36-1, p. 3.) Plaintiff asserts that he *did* have an obvious fracture on September 14, 2015, pointing to a later report by an outside orthopedist. (Pl.'s Resp. d/e 40, p. 14.) But the report he attaches is one page from a visit to the orthopedist November 18, 2015, when x-rays of the first visit with the orthopedist were compared to the follow-up visit with the orthopedist on November 18, 2015. (d/e 38-7, p. 2; d/e 38-7, p. 5.) Nothing in this report mentions the first x-ray on September

14, 2015.  Plaintiff alternatively asserts that the radiologist misread the first x-ray but he offers no evidence to support that conclusion.

Plaintiff received ibuprofen from September 15-21, 2015. (Nurse Defs.' Undisp. Fact 18.)  Plaintiff received ice packs on September 14, 15, 17, and 21, 2015.  (Nurse Defs.' Undisp. Fact 18.)

On September 22, 2015, Plaintiff saw a nurse for a purported re-injury to his right hand, asserting that he had fallen recently. (Defs.' Undisp. Fact 19.)  That was a lie.  Plaintiff had made up the story about falling because he felt desperate to obtain adequate pain medication for his original injury.  (Pl.'s Dep. 142.) Plaintiff received an ice pack that day and was referred to a physician. (Nurse Defs.' Undisp. Fact 19.)  Plaintiff also received ice packs the next two days.  (Defs.' Undisp. Fact 20.)

On September 23, 2015, Dr. Inoue examined Plaintiff's hand and noted "no frank deformity, good capillary refill, a positive pulse, and no increased warmth."  (Dr. Inoue Aff. ¶ 15.)  Dr. Inoue avers that he did not suspect an acute fracture because there was no change in appearance of Plaintiff's hand, and so did not order x-rays.  (Dr. Inoue Aff. ¶ 17.)  While Dr. Inoue did not order an x-ray

on September 23, he did order Naprosyn for ten days.  (Dr. Inoue

Aff. ¶ 16.)  Plaintiff received Naprosyn through September 29 and

again on October 1, 2015.  (Nurse Defs.' Undisp. Fact 24.)  From

October 2 through October 5, 2015, Plaintiff took Motrin instead of

Naprosyn because the Motrin had been prescribed for Plaintiff's

dental pain and was not to be taken with Naprosyn.  (Nurse Defs.'

Undisp. Fact 25.)

On October 1, 2015, Plaintiff asked to see health care about his

hand again.  This time he admitted that he had made up the story

about the fall and instead stated in his request that he had been in

fights.  (Nurse Defs.' Undisp. Fact 23; Pl.'s Dep. pp. 85-88.)

Dr. Valentine, who is not a defendant, examined Plaintiff's hand

on October 5, 2015, and found a bony abnormality.  Dr. Valentine

ordered a new set of x-rays, which showed an "acute spiral oblique

fracture of the midshaft fifth metacarpal."  (10/5/15 imaging report,

d/e 36-1, p. 11.)  Dr. Valentine ordered ibuprofen and referred

Plaintiff to McLean County Orthopedics.  (Nurse Defs.' Undisp. Fact

30.)

Plaintiff received Motrin the next two days, and saw Dr.

Armstrong at McLean County Orthopedics on October 7, 2015.

(Nurse. Defs.' Undisp. Facts 31, 32.)   Dr. Armstrong diagnosed a "moderately displaced small finger metacarpal shaft fracture." (Nurse Defs.' Undisp. Fact 32.)  Dr. Armstrong gave Plaintiff the option of a splint or cast for symptomatic relief, ordered no weight bearing for six weeks, and Tylenol for 30 days.  (Nurse Defs.' Undisp. Fact 32.)

Plaintiff received Tylenol from October 7 through October 17, 2015, and also from November 3 through November 7, 2015. (Nurse Defs.' Undisp. Fact 33.)  Plaintiff's Tylenol prescription ended November 8, 2015, but the nurse restarted the prescription for one day until Plaintiff could see a doctor.  Plaintiff saw Dr. Inoue the next day, and Dr. Inoue renewed the order for Tylenol for 30 days. (Nurse Defs.' Undisp. Fact 36. )  Plaintiff received Tylenol from November 21, 2015 to December 8, 2015.  (Nurse Defs.' Undisp. Fact 39.)  On November 27, 2015, Dr. Valentine ordered seven days of Naprosyn for Plaintiff's complaints of chest pain.  (Nurse Defs.' Undisp. Fact 40.)  Plaintiff received Naprosyn from November 27 to December 3, 2015.  (Nurse Defs.' Undisp. Fact 42.)

Plaintiff saw the Dr. Williams at McLean County Orthopedics on November 18, 2015, for a follow up visit.  X-rays from that visit

showed that the fracture was healing satisfactorily. (Nurse Defs.' Undisp. Fact 37.) Plaintiff's cast was removed. He was given range of motion exercises and encouraged to take calcium and vitamin D supplements. (d/e 38-7, p. 3.) Dr. Williams noted in his report that any deformity would not decrease function once Plaintiff's range of motion was re-established. (Nurse Defs.' Undisp. Fact 38.)

On December 9, 2015, Plaintiff was informed that his 30-day prescription for Tylenol had ended. Plaintiff asked for pain medication, and Defendant Nurse Sturgill told Plaintiff he could buy pain medication from the commissary until he saw a doctor. (Nurse Defs.' Undisp. Fact 43.) Dr. Valentine saw Plaintiff on December 11, 2015, and ordered physical therapy but did not order pain medicine. (Nurse Defs.' Undisp. Fact 45.) According to the medical records, Plaintiff requested to be prescribed the calcium and Vitamin D supplement mentioned by Dr. Williams, but Dr. Valentine did not order those for the stated reason that the supplements would not help with the healing of Plaintiff's fracture. (12/12/15 and 12/14/16 medical records, d/e 40, p. 29.)

Plaintiff asked for pain medicine on December 14, 2015, but Nurse Payne told him he could purchase pain medicine from the

commissary.  The next day Plaintiff asked to see the doctor because he needed pain medicine to engage in his physical therapy sessions. On December 16, 2015, Dr. Inoue prescribed two weeks of Tylenol. Plaintiff received Tylenol on December 20, 21, and 22, 2015. Plaintiff attended seven physical therapy appointments throughout December and January.  Plaintiff was discharged from physical therapy on January 11, 2016.  (Nurse Defs.' Undisp. Facts 46-51.)

Plaintiff continued to complain about pain in his hand after the physical therapy ended.  On January 20, 2016, Dr. Inoue prescribed Tylenol for two weeks.  In response to Plaintiff's complaint about increased swelling in his hand, Defendant Nurse Payne ordered ice packs for three days.  When Plaintiff reported to Defendant Nurse Brown of increased pain and a "pop" in his right hand, Nurse Brown referred Plaintiff to the doctor.  Dr. Valentine saw Plaintiff on January 25, 2016, and ordered Motrin for 3 days and x-rays.  According to the medical records, the x-rays showed no new fracture, though the Court does not see the x-ray report in the record.  Dr. Inoue did not enter any new orders after reviewing the x-ray report.  (Nurse Defs.' Undisp. Fact 52-61.)

Plaintiff received Motrin from January 25-31, 2016, and on February 4th and 5th, 2016. He received ice packs from January 25-29, 2015. (Nurse Defs.' Undisp. Fact 62-63.)

Plaintiff continued to complain of pain. Dr. Inoue prescribed Mobic for three weeks, ice packs as needed, and exercises for three weeks. (Nurse Defs.' Undisp. Fact 64.) Plaintiff received the Mobic daily from February 5-26, 2016, except for February 14, 2016. (Nurse Defs.' Undisp. Fact 65.) Defendants maintain that Plaintiff received ice packs daily from February 5-26, 2016, (Nurse Defs.' Undisp. Fact 66), but Plaintiff asserts he received no ice packs from February 16-26, 2016. (Pl.'s Resp., d/e 40, p. 7.) The exhibit Plaintiff attaches appears to reflect that no ice packs were given at all during the month of February. (d/e 40, p. 20.) Inexplicably, Defendants' copy of what appears to be the same exhibit appears to show that ice packs *were* given during February. (d/e 38-6, p. 12.) At this stage, the Court accepts Plaintiff's version that he received no ice packs in February.

On March 1, 2016, Plaintiff asked for an ice pack and pain medicine but was told that the prescriptions had run. Plaintiff was referred to a doctor. Dr. Rakestraw, who is not a defendant,

ordered 10 days of Mobic and no ice packs. (Nurse Defs.' Undisp. Facts 67, 68.) Plaintiff took the Mobic for ten days, from March 5, 2016, to March 14, 2016. Plaintiff told Defendant Nurse Brown that the Mobic was working well. Nurse Brown consulted with Dr. Rakestraw, who did not renew the Mobic but did prescribe ibuprofen. Plaintiff continued to seek pain medicine after that prescription ran, but Dr. Rakestraw, noting that the fracture had healed, entered no further orders, instructing Plaintiff to purchase pain medicine from the commissary. (Nurse Defs.' Undisp. Fact 74.)

On April 29, 2016, Plaintiff was transferred to the Illinois Department of Corrections.

## Discussion

Plaintiff was a detainee during the relevant time, so his claim is governed by the Fourteenth Amendment, not the Eighth Amendment. As of this writing, though, the Eighth Amendment and Fourteenth Amendment standard for medical claims is indistinguishable. Thomas v. Cook County Sheriff's Dept., 604 F.3d 293, 301 n.2 (7th Cir. 2010); Chapman v. Keltner, 241 F.3d 842, 845 (7th Cir. 2001). Plaintiff must show "(1) an objectively serious

injury or medical need was deprived; and (2) the official knew that the risk of injury was substantial but nevertheless failed to take reasonable measures to prevent it." <u>Chapman</u>, 241 F.3d at 845. The Seventh Circuit has indicated that the standard on detainee medical claims may need to be revisited in light of a relatively recent Supreme Court case, but as of now the subjective requirement remains deliberate indifference. <u>Collins v. Al-Shami</u>, 851 F.3d 727, 731 (7th Cir. 2017)(declining to decide whether <u>Kingsley v. Hendrickson</u>, 135 S.Ct. 2466 (2105) requires, for detainee's medical claims, an objective reasonableness standard versus a deliberate indifference standard); <u>Phillips v. Sheriff of Cook County</u>, 828 F.3d 541, 544 (7th Cir. 2016)(applying deliberate indifference standard to detainees' claims of lack of medical care, but acknowledging <u>Kingsley</u>).

Plaintiff's hand injury and pain allow a reasonable inference of an objectively serious medical need. The question is whether a rational juror could find that any of the Defendants were deliberately indifferent to those conditions.

Deliberate indifference, is not negligence (malpractice) or even gross negligence. <u>Chapman</u>, 241 F.3d at 845 (citation omitted).

Deliberate indifference is the conscious disregard of a known risk of substantial harm.  <u>Arnett v. Webster</u>, 658 F.3d 742, 751 (7th Cir. 2011).  Deliberate indifference in the medical context arises "'if the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment.'" <u>Roe v. Elyea</u>, 631 F.3d 843, 857 (7th Cir. 2011)(*quoting* <u>Sain v. Wood</u>, 512 F.3d 886, 894-95 (7th Cir. 2009).  "A medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have so responded under those circumstances." <u>Sain</u>, 512 F.3d at 894-95.  Deliberate indifference to "prolonged, unnecessary pain" also violates the Constitution.  <u>Smith v. Knox County Jail</u>, 666 F.3d 1037, 1040 (7th Cir. 2012)(internal and quoted cites omitted).

No juror could reasonably conclude that Defendants were deliberately indifferent to Plaintiff's hand injury or pain.  Plaintiff received multiple x-rays, outside consults at an orthopedic center, a cast, physical therapy, and frequent pain medicine prescriptions. Plaintiff did not receive all the treatment and pain medicine that he believed he should have received, but that is not evidence of

deliberate indifference.  <u>Dobbey v. Liping Zhang</u>, 608 Fed.Appx 406

(7th Cir. 2015)(not published in Fed. Rptr.)(inmate's "own assertions

that he did not receive adequate care and disagreed with the course

of treatment prescribed by the doctors—is nothing more than an

unwillingness to accept the professional judgment of his treating

physicians and not a basis for establishing deliberate indifference.").

   Plaintiff asserts that the first x-ray showed a fracture and that

Dr. Inoue should have realized this.  The documents Plaintiff cites

does not support either conclusion.  The Court sees nothing to

suggest that the first x-ray showed a fracture or was improperly

read by the radiologist.  Plaintiff also argues that Dr. Inoue should

have looked at the x-ray himself rather than relying on the

radiologist report, but he offers no evidence that Dr. Inoue's reliance

on the radiologist's reading of the x-ray was outside the standard of

care.  Plaintiff also contends that an MRI or CAT scan should have

been done in addition to or in substitution of the first x-ray.  There

is no evidence to support that assertion either.

   Plaintiff argues that Dr. Inoue missed diagnosing the fracture

on Plaintiff's visit on September 23, 2015.  It is true that Plaintiff

was ultimately diagnosed with a fracture on October 5, 2015,

though that fracture could have occurred before or after Plaintiff's visit with Dr. Inoue on September 23, 2015. Assuming that Plaintiff's hand was fractured when Dr. Inoue saw Plaintiff on September 23, Plaintiff has no evidence that Dr. Inoue's decision to take a wait-and-see approach and prescribe pain medicine was a substantial departure from accepted medical judgment. Dr. Inoue may have been mistaken—he may have missed diagnosing a fracture—but a mistake does not violate the Constitution. Cesal v. Moats, 851 F.3d 714, 724 (7th Cir. 2017)(there is an "important difference between ordinary, or even aggravated, medical malpractice, and an Eighth Amendment violation.").

Plaintiff points out that the vitamin supplements recommended by Dr. Williams (the outside orthopedist) were not prescribed at the Jail. But Plaintiff has no evidence that the refusal to prescribe the vitamins amounted to a deviation from professional protocols. Dr. Valentine, who is not a defendant anyway, determined that the supplements were not necessary. Disagreement about treatment decisions does not amount to a constitutional violation. Burton v. Downey, 805 F.3d 776, 786 (7th Cir. 2015)("evidence that another

doctor would have followed a different course of treatment is insufficient to sustain a deliberate indifference claim.").

As to the pain medicine, Plaintiff appears to take the position that he should have been prescribed pain medicine for every day of his detention at the Jail after he suffered the hand injury. But Plaintiff has no evidence that the decision to put end-dates on the pain prescriptions was outside the standard of care for Plaintiff's injury, which appeared to be healing as expected. Further, Plaintiff *was* prescribed pain medication for the majority of his detention after the injury. For the dates he was not prescribed pain medicine, Plaintiff offers no evidence to support his assertion that he had no money to buy pain medicine. In any event, the only rational conclusion on this record is that any decisions not to prescribe pain medicine, and any decisions regarding what kind of pain medicine to prescribe, were exercises of professional judgment. *See* <u>Burton v. Downey</u>, 805 F.3d 776, 786 (7th Cir. 2015)(affirming summary judgment where doctor prescribed non-narcotic pain medicine rather than the narcotic pain medicine the plaintiff had previously received on occasion).

Plaintiff asserts that he did not get any pain medicine from December 17, 2015, through January 19, 2016, while he was engaging in what he describes as painful physical therapy sessions.[4]  However, he does not dispute that the physical therapy sessions ended on January 11, 2016, or that Dr. Inoue prescribed Tylenol for two weeks starting on December 16, 2015, which would have ended on December 30, 2015.  Plaintiff offers no evidence that Dr. Inoue made a conscious decision not to renew that prescription.  In fact, Dr. Inoue did order a new pain prescription on January 20, 2015.  Additionally, Plaintiff offers no evidence that his not receiving the prescribed medicine in December was attributable to Defendants, must less deliberately or recklessly so.  The same goes for the ice packs Plaintiff did not receive in February.

Plaintiff also seems to contend that the Nurse Defendants did not consult with the doctors about Plaintiff's request for pain medicine, or did not consult quickly enough, but there is no admissible evidence to support that conclusion.  The Nurse Defendants are not liable for deciding to wait for a doctor to

---

[4] Plaintiff does not explain how he was able to move his hand in the physical therapy sessions yet is still not able to use his hand at all.

prescribe pain medicine before dispensing pain medicine. Telling Plaintiff that his prescription had run out and that he must buy pain medicine off the commissary was not a constitutional violation. Plaintiff also contends in his response that he tried to obtain medical attention for his hand on September 10, 2015, but the officers told him the nurses were going home and to wait until the next day. The Nurse defendants are not liable for that purported delay.

Lastly, Plaintiff claims he has permanent nerve damage, has not regained his range of motion, and suffers anxiety, post-traumatic stress disorder, and depression because of the alleged lack of care. Plaintiff has not offered evidence that he actually has permanent nerve damage or that his reduced range of motion and psychiatric problems were caused by any actions or inactions of Defendants. Defendants had no objective reason to think that their approach was not working. Dr. Williams, the outside orthopedist, discharged Plaintiff in November 2015, taking off the cast and noting that Plaintiff should regain full functionality with range of motion exercises. Physical therapy was provided for that purpose, and a follow-up x-ray showed no new fracture. Even assuming

Plaintiff's hand is still not functional, Plaintiff has no evidence that is Defendants' fault, much less the product of deliberate indifference.

**IT IS THEREFORE ORDERED:**

1.  Plaintiff's filing docketed on December 23, 2016, is struck [43] because the filing bears no signature.

2.  Defendants' motions for summary judgment are granted [36], [38].  The clerk of the court is directed to enter judgment in favor of Defendants and against Plaintiff.  This case is terminated. All deadlines and settings on the Court's calendar are vacated.

2.  Defendants may file a bill of costs within the time allotted by Local Rule.  If Plaintiff objects to the assessment of costs based on indigency, he must file a timely objection and attach his trust fund ledgers for the past year.

3.  If Plaintiff wishes to appeal this judgment, he must file a notice of appeal with this Court within 30 days of the entry of judgment.  Fed. R. App. P. 4(a)(4).  A motion for leave to appeal in forma pauperis should identify the issues Plaintiff will present on appeal.  See Fed. R. App. P. 24(a)(1)(c).  If Plaintiff does choose to

appeal, he will be liable for the $505.00 appellate filing fee regardless of the outcome of the appeal.

ENTERED: 7/5/2017

FOR THE COURT:

_s/Michael M Mihm_
MICHAEL M. MIHM
UNITED STATES DISTRICT JUDGE
